IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN M. MADRIGAL, aka Refugio Muniz Madrigal,<br><br>　　　　　Petitioner,<br><br>　v.<br><br>JAMES YATES, Warden,<br><br>　　　　　Respondent.　　　　　／ | No. C 06-3434 CRB (PR)<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

Petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons set forth below, the petition is denied.

## STATEMENT OF THE CASE

After a court trial in the Superior Court of the State of California in and for the County of Santa Clara, petitioner was found guilty of multiple offenses: (1) three counts of rape of a child under age 14; (2) one count of a lewd or lascivious act on a child under 14; (3) one count of a lewd or lascivious act on a child by force; and (4) one enhancement for the infliction of great bodily injury on the victim. See Cal. Penal Code §§ 261, 269, 288(a),(b), 12022.7, 12022.53. Petitioner was sentenced to 72 years in prison.

Petitioner appealed and, on May 17, 2005, the California Court of Appeal affirmed his conviction. On August 10, 2005, the California Supreme Court denied review.

Petitioner timely filed the instant petition for a federal writ of habeas corpus under 28

U.S.C. § 2254. Per order filed on September 6, 2006, this Court found petitioner's claims cognizable under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent has filed an answer. Petitioner did not file a traverse.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

> Some time during the 2002/2003 school year, defendant's six-year-old daughter (victim), a student, complained to her school's health clerk Yolanda Guerra of pain in her vagina. At the time, victim was living in the children's shelter. Guerra observed "small holes" or ulcers on victim's vagina and she called the nurse at the shelter. The nurse sent Desitin ointment to Guerra for victim. Guerra applied it to victim's vagina at least two or three times before she asked victim if somebody touched her there. By then she had learned from the nurse and the social worker at the shelter that victim had herpes. When Guerra told victim to tell her who had touched her, at first victim denied it. However, Guerra said, "somebody did, that's why you're having pain," and victim admitted that her "daddy put his thing on her vagina." Guerra understood "thing" to refer to "penis." Victim was crying and quiet. She said it happened in her room in the night time on the bed. There were bunk beds in the room but victim stated that she and her father slept in the bottom bed and that it happened more than once.
>
> San Jose Police Detective Kevin McMillan contacted defendant and made an appointment for him to give a statement. Defendant appeared at the police station on March 7, 2003, and the interview was initially conducted by McMillan in Spanish. McMillan told defendant "you don't have to talk with me if you don't want to, okay, you are here, how do [you] say it ahm-voluntary, okay." McMillan did not advise defendant of his Miranda rights or that he could terminate the interview at any time and leave. McMillan then asked defendant for identification and told him he knew defendant had a problem with the police before when he was using his brother's identification and that he knew defendant had gone to jail.
>
> McMillan then asked defendant for his address and telephone number, where he worked, and if defendant knew "why we are here." Defendant said "for my daughter," and McMillan asked "what happened with your daughter?" Defendant said, "they say she came out with an illness." McMillan returned to the subject of defendant's address, elicited that defendant was arrested for domestic violence in 1997 and went by the name Refugio, and was incarcerated for seven days. Defendant stated he had been in the United States for 10 years, having entered around 1988. McMillan asked about victim's mother. Defendant said they were separated, that victim had lived with her mother in one town in Mexico for a while and then with her grandmother in another town in Mexico, but then "they sent her over here to me" because "kids got lost in Mexico." Victim had lived with defendant for almost two years.
>
> McMillan asked if defendant knew the name of the illness that victim had and defendant replied, "it looks like herpes." McMillan told defendant that the social worker said that defendant had told her he had herpes as well. Defendant stated he did not know if he had it or not, but that he had an illness

2

in Mexico. McMillan asked defendant how he got the herpes and defendant replied that he had gotten it from a "lady of the streets" in 1998. He stated the doctor who treated him in Mexico called it "decomposition." Defendant said he did not know what it was called in the United States. However, defendant had told the social worker he had herpes, so McMillan asked how he knew he had herpes. Defendant replied he did not know "if it was herpes," and said that the social worker may have misunderstood him. Defendant stated the illness "comes and goes," and that his last symptoms were two months earlier, 15 days after he first took victim to the doctor for her symptoms. The incubation period for the disease is from two to 12 days.

McMillan asked defendant how he thought victim got herpes. Defendant said he did not know and that he was the only one at the house with herpes. McMillan said, "okay-so if you are the only person that has herpes, how is she going to contract it?" Defendant replied, "who knows?" McMillan responded, "I'm asking you but I think you know." Defendant said "it probably was like this, that I might have-that I touched her, I believe . . . on the parts." McMillan asked why he was touching victim, and defendant said, "I cured her also." Defendant stated that victim had complained about pain and he saw that it was "a little red there-I began to cure her." Defendant used "Desetin [ sic ] . . . the stuff used for the rawness."

At first defendant claimed victim hurt herself jumping a lot with some other little girls at the house in San Jose which he and victim shared with other people including two male relatives who slept in the same room with defendant and victim. However, Sergeant Maria Abruzzini who joined the interview 15 minutes after it started, said "playing, jumping is not going to do that to her." Defendant finally explained that victim complained that it hurt her when she urinated so he looked at her vagina and saw "a little scratch, like one gets." He first took her to a doctor on February 8. Between February 8 and February 12, victim appeared to get better, but on February 12, "she began to feel bad," so defendant looked at her vagina again and saw "more reddish the little things I noticed that it was scratched." He asked his nephew's wife Lorena to look at victim. She said victim was "more ill" so defendant took her back to the doctor on the same day.

When defendant first saw the redness on victim's vagina, he thought that "some other man [at the house] had gotten her." But on February 12, defendant thought "that perhaps I was the one who gave her the illness." Defendant stated he asked victim "several things" and she told him that she had hurt herself on the little bed. Defendant stated his room had bunk beds and that victim told him that she "hurt herself with the other little girl." McMillan told defendant that the police had done a lot of investigation and he knew that defendant and victim had the same type of herpes and that he knew that defendant and victim were "using the same bed for a long time at the house." Defendant responded, "primarily yes, the girl got on top of me."

Defendant stated victim got on top of him in bed in the evening. He was wearing shorts and she had "her little pants on." He was watching television and he "took her off me and . . . [p]erhaps that's when I gave it to her."

Abruzzini asked defendant where he had herpes at the time that victim got on top of him. He stated it was at the tip of his penis. Abruzzini explained that herpes was transmitted by skin-to-skin touching and asked how it was that

3

defendant's penis touched victim's vagina if both he and victim were clothed. Defendant at first said he did not know, then he agreed that his penis came out of his shorts; then he agreed that he had "a little bit" of an erection. Defendant finally admitted that victim was unclothed, then said that she "was all over me and I would even hit her so that she would not do that," and that she did it all the time, but that the time before he took her to the doctor was the last time.

Defendant denied that his penis entered victim's vagina. Abruzzini then asked him how he was going to explain to victim that he gave her herpes, and defendant started crying. Abruzzini and McMillan left the room so that defendant could compose himself. When they returned, Abruzzini stated that if defendant wanted forgiveness from God and his daughter, "you have to say everything . . . because she needs this."

Abruzzini asked defendant to "tell from the beginning" and asked when it happened the first time. Defendant stated victim's grandmother sent victim to defendant about a year and a half earlier, when victim was five years old. Victim arrived in December 2001 and she started "g[etting] on top of" defendant in June. Defendant was drinking "a lot" but after four or five months, he came to realize he was making a mistake and he was "even . . . letting go of the drinking" because he "was making an error."

Defendant was adamant that victim got on top of him and denied that he got on top of her. On the last occasion when defendant was experiencing symptoms and thought he might have transmitted the disease to her, they were watching cartoons on television. He told her she could take off her clothes. She sat on top of his penis which was "a little" hard. Defendant's penis came out of his shorts and he had an orgasm. Defendant denied penetrating victim's vagina although he finally admitted that his penis touched it and he ejaculated. Defendant stated it happened three times, that he had an orgasm each time, and that he also touched her with his fingers but he denied putting his finger in her vagina. Defendant said victim would get too close to people and she liked to get all over him and he would scold her and once he even hit her so she would not do that. Defendant denied telling victim not to tell anyone about the molestations. At the end of the interview McMillan suggested defendant write a letter of apology to victim, after which defendant was arrested.

Mary Ritter, a physician's assistant, performed a Sexual Assault Response Team (SART) examination on victim on February 14, 2003. The exam revealed "crusty debris on the inside of her labia majora and . . . ulcerated areas on the labia minora in a couple of places." Pain resulted from the examination of those areas. Victim had contracted Herpes Simplex Virus Type 2. It goes into remission but it cannot be cured. It is normally transmitted sexually. There was no evidence of any penetrating injury.

People v. Madrigal, No. H027070, 2005 WL 1153091, at *1-4 (Cal. Ct. App. May 17, 2005)

(footnotes omitted)

**DISCUSSION**

**I.      Standard of Review**

4

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state

5

court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

## II. Claims

Petitioner seeks federal habeas relief on the grounds that his conviction rests on a violation of his Miranda rights and insufficient evidence.

### A. Miranda Violation

Petitioner claims that midway through his interrogation, he effectively confessed to a "lewd or lascivious act . . . upon or with the body . . . of a child who is under the age of 14" in violation of California Penal Code § 288(a). According to petitioner, this mid-interrogation confession rendered him in "custody" for Miranda purposes and, because his interrogators failed to read him his Miranda rights, all later statements should have been suppressed at trial.[1] The California Court of Appeal rejected petitioner's Miranda claim on the ground that petitioner was never in custody. Petitioner argues that the state court's failure to consider his confession as a factor weighing on the custodial analysis resulted in an "unreasonable application" of federal law. See Williams, 529 U.S. at 413.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that suspects interrogated while in police custody must be told that they have the right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney at the interrogation. Id. at 444. The use of non-Mirandized statements for substantive purposes in a criminal trial violates the Fifth Amendment's privilege against self-incrimination. Id. at 479; Jackson v. Giurbino, 364 F.3d 1002, 1008-10 (9th Cir. 2004).

---

[1] Petitioner claims that he confessed to a lewd or lascivious act at the specific point of the transcript in which his interrogators asked him how he would explain to his daughter that he gave her herpes and he broke out in tears, crying "May God forgive me." TR at 29. This point is significant because it is before petitioner admitted, *inter alia*, to multiple occasions during which he ejaculated on or in the presence of victim. TR at 43-46.

6

The Miranda requirements are only triggered "where there has been such a restriction on a person's freedom as to render him 'in custody.'" Stansbury v. California, 511 U.S. 318, 322 (1994). The "in custody" determination requires consideration of the "totality of circumstances" surrounding a suspect's interrogation. Thompson v. Keohane, 516 U.S. 99, 112-13 (1995). A suspect is in custody if a "reasonable person" in the suspect's position would "have felt he or she was not at liberty to terminate the interrogation and leave." Id. at 112. For a suspect to be "in custody," there must be a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id.

Because the "in custody" determination requires the application of a "general standard" (as opposed to a "specific rule"), it necessarily involves a "substantial element of judgment." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Therefore, in the federal habeas context, a state court's case-by-case "in custody" determination is granted additional "leeway" and does not involve an "unreasonable application" of federal law so long as it "fits within the matrix of [the Supreme Court's] prior decisions." Id. at 664-65.

Here, the California Court of Appeal concluded that petitioner was not in custody. People v. Madrigal, 2005 WL 1153091, at *6. To reach this conclusion, the state court looked at the totality of circumstances surrounding petitioner's interrogation. Id. at *5-6. The court emphasized the presence of several factors cutting against a finding of custody. First, petitioner voluntarily drove himself to the interview and was never placed under formal arrest or threatened with formal arrest. Id. at *5. Second, petitioner was told that he did not have to talk and that he was there voluntarily. Id. Third, petitioner was left alone for a period during the interview and later given coffee and water. Id. Fourth, there is no evidence that the interrogation room was locked and, because an officer entered mid-interview after knocking, there is at least an inference that the door was unlocked. Id.

The California Court of Appeal also took note of several factors that would favor finding petitioner in custody. First, petitioner was not explicitly told that he could terminate

7

the interview and leave at anytime. Id. at *6.  Second, the tenor of his interrogator's questions implied that petitioner was suspected of molesting his daughter. Id. *5-6.  Third, the questioning took place in an interrogation room and was conducted by two officers. Id. at *6.

The state court concluded that on the balance of these factors, a reasonable person in petitioner's position would not believe that he was in custody. Id.  The state court therefore deemed petitioner's interrogation noncustodial and rejected his Miranda claim. Id.

The gravamen of petitioner's habeas claim is that the state court's custodial analysis failed to account for his mid-interrogation confession to a lewd and lascivious act.  A mid-interrogation confession is relevant, petitioner contends, because a reasonable person is less likely to feel free to leave an interrogation after confessing to a serious crime. See McCrory v. State, 643 S.W.2d 725, 733 (Tex. Crim. App. 1982).  Petitioner argues that the state court's failure to account for his mid-interrogation confession to a lewd or lascivious act involved two errors.  First, petitioner argues that the state court should have applied a bright-line rule that confession to a serious crime renders all subsequent interrogation custodial.  Second, petitioner argues that his mid-interrogation confession is at least a factor in the custodial analysis and that the state court's failure to consider it resulted in an unreasonable application of federal law.

Petitioner's proposed bright-line rule must be rejected because it is not compelled by existing Supreme Court precedent.  Simply put, the Supreme Court has never held that a confession renders subsequent interrogation custodial.  For this reason, the state court's failure in the instant case to adopt petitioner's proposed bright-line rule–that all post-confession interrogation is custodial–was neither "contrary to" nor involved an "unreasonable application" of clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d); Williams, 529 U.S. at 413.  At best, confession to a crime is one fact among many that can bear on the "in custody" determination.

8

Petitioner's second argument must also be rejected. The transcript shows that petitioner never openly confessed while he was being interrogated. See TR 1-54. The transcript shows that instead of confessing, petitioner made incriminating statements in an effort to describe how he might have innocently transmitted herpes to his daughter.[2] Petitioner was trying to exculpate himself, not confess.[3] Therefore, even if it is assumed that the state court failed to account for petitioner's mid-interrogation "confession," including this factor in the "totality of circumstances" analysis would have had little, if any, impact on the custodial determination. This of course is because the marginal significance of petitioner's alleged confession must be weighed against those factors, carefully delineated by the state court, that suggest he was not in custody. Of particular importance in this respect is the fact that petitioner voluntarily went to the interview and acknowledged that he was there voluntarily. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (driving to interview voluntarily cuts against finding custody). And, as the state court noted, petitioner was never physically constrained or threatened with arrest, and he was given an opportunity to take a break mid-interview. See Yarborough, 541 U.S. at 664 (presence of these factors supports "no custody" determination).

In short, the state court's deliberative analysis of the custodial factors in this case places its determination firmly within the "matrix" of the Supreme Court's cases. See

---

[2] In particular, at the outset of the interview, petitioner stated that victim injured her vagina while playing and suggested that he may have infected her when applying medicine. TR at 10-11. His interrogators did not accept this theory and told petitioner that victim had told them what had happened. TR at 20-21. Petitioner then explained that victim could have been infected when "she got on top" of him. TR at 21. Specifically, petitioner explained that his penis, which was partially erect and displaying herpes symptoms at the time, may have come out the side of his shorts and touched his daughter who was playing without her clothes on. TR at 21-29. These events may well depict a "lewd or lascivious" act in violation of California Penal Code § 288; however, it cannot be said that petitioner clearly was "confessing" to the same in any ordinary sense.

[3] This fact distinguishes the instant case from McCrory, 643 S.W.2d 725, the lead case cited by petitioner. In McCrory, the criminal defendant stated, "I did it; I killed her." Id. at 733. Petitioner in the instant case never made such an undisputable, matter of fact, confession. Even if McCrory was clearly established Supreme Court precedent (which it is not), it is factually distinguishable.

9

Yarborough, 541 U.S. at 665. Adding petitioner's alleged confession to the totality of circumstances does not tip the scales and render that determination objectively unreasonable. See 28 U.S.C. § 2254(d); Williams, 529 U.S. at 409.

This conclusion is further supported by Supreme Court precedents which suggest that a mid-interrogation confession, even an unambiguous one, is not a major factor in the custodial analysis. Most significantly, the petitioner in Yarborough confessed to helping an accomplice steal a car and then later in the interrogation confessed to facts that implicated him in the car owner's murder. See Yarborough, 541 U.S. at 658. The Yarborough Court did not hold that the petitioner's confession to a car theft rendered his later non-Mirandized admissions suppressible. Rather, the Court upheld the state court's determination that his entire interrogation was noncustodial. Id. at 665; see also United States v. Norris, 428 F.3d 907, 911(9th Cir. 2005) (interview did not become custodial after suspect confessed to act of sexual molestation).

Because the state court's custodial analysis did not involve an objectively unreasonable application of established Supreme Court precedent, petitioner is not entitled to habeas relief on his Miranda violation claim. See 28 U.S.C. § 2254(d); Williams, 529 U.S. at 409.

### B.     Insufficiency of the Evidence

Petitioner claims that there was insufficient evidence to support his conviction of three counts of rape. He specifically claims that there was insufficient evidence of penetration for two of the counts and insufficient evidence of force or duress for all three.

The relevant inquiry on review of a constitutional challenge to the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Circumstantial evidence and inferences drawn from that

10

evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995). If conflicting inferences can be drawn, a reviewing court must "presume - even if it does not affirmatively appear on the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. Nevertheless, a conviction cannot rest on pure speculation or suspicion. Walters, 45 F.3d at 1358.

In light of 28 U.S.C. § 2254(d), a federal habeas court applies the standard of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). A federal habeas court must ask whether the operative state court decision reflected an unreasonable application of Jackson to the facts of the case. Id. at 1275. A writ may be granted only if the state court's application of the Jackson standard was "objectively unreasonable." Id. at 1275 n.13.

Here, petitioner was convicted of three counts of rape of a child under age 14. See Cal. Penal Code § 269(a). Under California law, "rape" is defined, *inter alia*, as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [w]here it is accomplished against a person's will by means of force, violence, duress, menace or fear of immediate and unlawful bodily injury on the person or another." Id. § 261. "Any sexual penetration, however slight, is sufficient to complete the crime" of rape. Id. § 263.

### 1. **Evidence of Penetration**

The California Court of Appeal summarized the evidence of penetration as follows:

> Victim had herpes ulceration on both the interior vaginal walls and on the labia. The [medical] examiner testified that transmission of the herpes virus occurs when an infected surface touches an uninfected area. Defendant admitted that his penis touched the outside of victim's vagina. For this to happen, his penis had to penetrate victim's external genitalia. In addition, [the medical examiner] testified that victim told her that defendant put his penis "on" her vagina.

People v. Madrigal, 2005 WL 1153091, at *8.

The court then explained that, under California law, "[p]enetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape

11

even if the rapist does not thereafter succeed in penetrating into the vagina." Id. at *7 (quoting People v. Karsai, 131 Cal. App. 3d 224, 232 (1982), overruled on other grounds by People v. Jones, 46 Cal. 3d 585 (1988)).  Any contact inside the exterior vaginal lips constitutes penetration for rape. Id. (citing People v. Quintana, 89 Cal. App. 4th 1362, 1371 (2001)).  Relying on this definition, the court concluded that there was sufficient evidence of penetration to support petitioner's three rape convictions under the Jackson standard. Id. at *8.  This determination was not an objectively unreasonable application of Jackson. See Juan H., 408 F.3d at 1275 n.13.

It is well-established that this Court is bound by the state court's definition of sexual penetration, see Bradshaw v. Richey, 546 U.S. 74, 76 (2005), and, under this definition, there is little doubt that a rational juror could have found penetration beyond a reasonable doubt. See Jackson, 433 U.S. at 319.  Of particular force is evidence that victim suffered herpes sores on the inside of her vagina. People v. Madrigal, 2005 WL 1153091, at *8.  This evidence of penetration is strengthened by petitioner's admission that the internal lesions may have been caused by his semen, which entered victim's vagina. Id. at *7.  Further, victim told her medical examiner that petitioner put his penis "on" her vagina, which suggests penetration of the external genitalia. Id. at 8.  This evidence, taken together, strongly supports an inference of penetration as defined by California law. See Walters, 45 F.3d at 1358 (inferences from circumstantial evidence can sufficiently support conviction).

Petitioner's contention that the evidence supports only a single instance of penetration is not borne out by the record.  As the state court noted, victim's medical examiner testified that victim told her "daddy put his thing on her vagina" more than once. People v. Madrigal, 2005 WL 1153091, at *7.  Further, in explaining how victim may have contracted herpes, petitioner told his interrogators that victim climbed on top of him on multiple occasions. Id. Based on this evidence, a rational juror could have found sufficient evidence of three instances of penetration. See Jackson, 433 U.S. at 319.

12

This conclusion is supported by additional evidence of multiple penetrations that the state court failed to make explicit. In particular, petitioner explained during his interrogation that his semen may have entered victim's vagina on three occasions.[4] Such an admission is powerful evidence of three instances of sexual penetration as defined by California law.

The state court's determination that there was sufficient evidence of three instances of penetration was not an objectively unreasonable application of the Jackson standard. See Juan H., 408 F.3d at 1275 n.13. Petitioner is not entitled to habeas relief on his claim that his conviction rests on insufficient evidence of penetration. See 28 U.S.C. § 2254(d).

### 2. **Evidence of Duress**

The California Court of Appeal did not find sufficient evidence of force to sustain a conviction of rape under California Penal Code §§ 269, 261. See People v. Madrigal, 2005 WL 1153091, at *8. It found sufficient evidence of duress, however. Id. *9. Under California law, "[d]uress means a direct or implied threat of force, violence, danger, . . . or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted." Id. (quoting People v. Leal, 33 Cal. 4th 999, 1006 (2004)). Duress can involve psychological coercion and can arise, at least in part, from the

---

[4] After explaining that he his semen might have transmitted herpes to his daughter, petitioner had the detectives had the following exchange:

| | |
|---|---|
| Petitioner: | yes – whatever–yes more or less – I'm telling you, one ejaculates |
| Det. McMillin: | so–Juan, how many times in total did this happen |
| Petitioner: | I promise you only that there were one or two times – or three times that I did it |
| | * * * * |
| Det. McMillin: | so, possibly there were more times because you where drinking? |
| Petitioner: | no, it's like – that I can remember, right |
| Det. McMillin | okay you remember three times? |
| Petitioner: | yeah |

TR at 44.

13

relationship, and relative size and ages of the defendant and the victim.  Id.  (internal quotations omitted).

The California Court of Appeal explained why, under California law, there was sufficient evidence of duress in this case:

> In this case, defendant was victim's father and in a position of trust and authority.  Victim was under his complete physical control.  She was six years old, Spanish-speaking, in a new country for less than two years, without her mother or grandmother with whom she had lived previously, living in a house with 10 people and in a room with her father and two other men.  She slept in the same bed as her father.  Victim was 48.5 inches tall and weighed 45 pounds.  Defendant was 31 years older than victim, outweighed her by more than a hundred pounds, and "towered over her" by more than a foot and a half.

Id.

Petitioner claims the evidence was insufficient to establish duress under California law because duress cannot be shown solely on the basis of the relationship between the victim and defendant and their comparative sizes and ages.  For this proposition, petitioner relies on People v. Espinoza, 95 Cal. App. 4th 1287 (2002), which found a father-daughter relationship and size disparity insufficient, standing alone, to establish duress.  As petitioner recounts, Espinoza holds that "[p]sychological coercion without more does not establish duress."  Id. at 1321 (internal quotation omitted).  Rather, "[a]t a minimum there must be an implied threat of force, violence, danger, hardship or retribution."  Id.

Even if the Espinoza court's construction of California law were controlling, the test for duress it established is fairly met by the facts at bar.  The state court of appeal in petitioner's case observed that he "hit and scolded victim."  People v. Madrigal, 2005 WL 1153091, at *9.  The effect of this "chastisement . . . was to create a state of mind in victim of submission to and fear of defendant."  Id.  Moreover, the court explained that victim, as a 45-pound girl in a new country and away from her mother and grandmother, relied exclusively on, and was under the almost complete control of, petitioner.  Id.  These facts are evidence of implied threats of "force" and "hardship" sufficient to establish duress under the test set out in Espinoza.

14

The state court's determination that there was sufficient evidence of duress was not "objectively unreasonable" even when measured against the intermediate state court's more restrictive definition of "duress" proposed by petitioner.  See Juan H., 408 F.3d at 1275 n.13.  Petitioner is not entitled to federal habeas relief on his claim of insufficient evidence of duress.  See 22 U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: November 2, 2007

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2006\3434\MadrigalHabeasDenial.wpd

15